**[J-61-2023] [MO: Todd, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

|  |  |  |
|---|---|---|
| B.C., | : | No. 8 WAP 2023 |
|  | : |  |
| Appellee | : | Appeal from the Order of the |
|  | : | Superior Court entered January 6, |
|  | : | 2023, at No. 515 WDA 2022, |
| v. | : | affirming the Order of the Court of |
|  | : | Common Pleas Westmoreland |
|  | : | County entered April 18, 2022, at |
| C.P. AND D.B., | : | No. 1494 of 2021-D. |
|  | : |  |
| Appellants | : | SUBMITTED: August 25, 2023 |

**CONCURRING OPINION**

**JUSTICE WECHT**                                        **DECIDED: JANUARY 29, 2024**

The Majority applies the presumption of paternity as it currently exists in our common law. That presumption, as this Court has articulated it, serves to preserve intact marriages. The determination of whether a marriage is intact is a fact-specific inquiry, one that includes consideration of the effect, if any, of periods of separation. The Majority accurately applies the presumption, recognizing that no party has called the continuing vitality of the presumption into question. So, I am compelled to concur with the decision it reaches today. Nonetheless, I am troubled by the lack of legislative action in this area of law, which forces the Court to cling to outdated fictions and to focus upon the behavior of the adults rather than upon the children's best interests.

The "two great fictions of the law of paternity"[1] — the presumption of paternity and paternity by estoppel — have formed the bases of our paternity law. As the Majority

---

[1]     *Brinkley v. King*, 701 A.2d 176, 180 (Pa. 1997).

recounts, the presumption of paternity has applied to prevent a third party from intruding upon a marriage.[2] The presumption had been deemed irrebuttable, absent evidence that the husband lacked access to the wife during the period of conception or that the husband was unable physically to procreate. In *Brinkley v. King*, the opinion announcing the judgment of the court limited the applicability of the presumption to those cases in which its use would further the objective of preserving the family unit.[3]

When the presumption does not apply or has been rebutted, a court next must consider whether paternity by estoppel applies. Estoppel essentially prevents a party from denying a role that he or she assumed.[4, 5] The policy underlying the estoppel doctrine is that a child should be secure in the knowledge of who his or her parents are. "If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father."[6] However, there are

---

[2] *See* Maj. Op. at 14-15; *Brinkley*, 701 A.2d at 180.

[3] "Today, however, separation, divorce, and children born during marriage to third party fathers is relatively common, and it is considerably less apparent that application of the presumption to all cases in which the child was conceived or born during the marriage is fair." *Brinkley*, 701 A.2d at 181.

[4] *See K.E.M. v. P.C.S.*, 38 A.d 798, 801 (Pa. 2012) ("[T]he doctrine embodies a legal determination that one may be deemed a parent based on his holding himself out as such.").

[5] Application of estoppel can result in seemingly unfair outcomes, as occurred in *Barr v. Bartolo*, 927 A.2d 635 (Pa. Super. 2007), where a former husband was not required to pay child support because he was not the biological father and a biological father was not required to pay child support as the former husband was estopped from denying legal parentage.

[6] *Brinkley*, 701 A.2d at 180.

exceptions, such as when there is fraud[7] or when parents stop holding themselves out as a parent once parentage has been called into question.[8]

In the absence of direct legislation to the contrary, our courts have treated the presumption of paternity and paternity by estoppel "as thresholds to a court directive for genetic testing."[9] Overall, these cases hinge upon minute details and necessitate difficult determinations of whether a marriage is, or is not, intact, whether or when fraud or fraud by omission occurred, or whether post-revelation conduct is sufficient to deny parentage.

To be fair, the General Assembly has attempted to legislate in this area. The Uniform Act on Blood Tests to Determine Paternity might at first blush appear to be helpful.[10] The statute provides for blood tests "[i]n any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact."[11] A version of this act has been on the books in some form since at least 1951.[12] However, the current statute, which has not been amended since it was enacted in 1990, is hopelessly outdated. The

---

[7]    *See, e.g., Glover v. Severino*, 946 A.2d 710 (Pa. Super. 2008) (holding that a mother committed fraud when she continued to assert the defendant was the father despite the DNA results); *Gebler v. Gotti*, 895 A.2d (Pa. Super. 2006) (finding fraud by omission when the mother did not inform the alleged father that there was a possibility that he was not the father).

[8]    *See, e.g., Vargo v. Schwartz*, 940 A.2d 459 (Pa. Super. 2007) (holding that the former husband's conduct in publicly denying parentage after learning he was not the father was sufficient to defeat estoppel); *Moyer v. Gresh*, 904 A.2d 958 (Pa. Super. 2006) (holding that former husband's continued involvement as a parent after learning that he was not the biological father estopped biological father from intervening in custody case).

[9]    *K.E.M.*, 38 A.3d at 801.

[10]    23 Pa.C.S. § 5104.

[11]    Id. § 5104(c).

[12]    *See Com. ex rel. O'Brien v. O'Brien*, 136 A.2d 451, 452 (Pa. 1957) (discussing Act of May 24, 1951, P.L. 402, § 1, 28 P.S. § 306, which provides for blood grouping tests to establish paternity, but noting the limitations of the act, such as only the male defendant/putative father could move for the testing).

relevant statutory provision commands that a court order blood tests and appoint "experts qualified as examiners of blood types" who will testify to their findings and be subject to cross-examination.[13]  Clearly, this type of evidence is no longer the most efficient scientific method for determining paternity.

Further, this Court has subordinated the statute to the two fictions of paternity law. In *John M. v. Paula T.*,[14] a third party, John, sought to compel the husband, Michael, to take a Human Leukocyte Antigen ("HLA") blood test.[15]  The trial court denied the motion based upon the presumption of paternity.[16]  The Superior Court reversed, holding that the Uniform Act on Blood Tests to Determine Paternity "relaxed" the presumption.  This Court weighed the rights of the third party against those of the husband, the mother, the child, and the Commonwealth in protecting the family as a "basic and fundamental unit of society,"[17] and disagreed.  The Court considered paternity by estoppel cases that held that blood tests were irrelevant when estoppel applied.[18]  Essentially, this Court ruled that the Act was unavailable unless the presumption and estoppel were inapplicable.[19]

---

[13]     23 Pa.C.S. § 5104(d).

[14]     571 A.2d 1380 (Pa. 1990).

[15]     "HLA tests . . . compare the blood types of the relevant parties and calculate the statistical probability that a given person is the child's parent as opposed to someone in the general population with the same characteristics. . . .  The HLA blood grouping tests provide circumstantial evidence of paternity whereas DNA test results provide direct evidence of biological parentage. . . ."  *Brinkley*, 701 A.2d at 186 n.9 (Newman, J., concurring and dissenting).

[16]     At the time of the case, the presumption was still called the presumption of legitimacy, although the Court discarded that name as the legislature has eliminated the distinction between legitimate and illegitimate children.  *John M.*, 571 A.2d at 1383 n.2.

[17]     *Id.* at 1385-86.

[18]     *Id.* at 1386.

[19]     *See also id.* at 1388 (Nix, C.J., concurring) (joined by all Justices) ("The Act does not relax the presumption that a child born to a marriage is a 'child of the marriage'. . . (continued…)

Following *John M.* and its specific emphasis upon the continuing viability of the presumption and estoppel notwithstanding the Act, some courts nonetheless granted blood tests pursuant to the Act, while most others followed case law.[20]  In *K.E.M.*, this Court held that the Act should apply when there is a divorce or separation, but it is unclear whether that decision caused a widespread change.[21,22]  Despite these decades of case law, the General Assembly has chosen neither to update the statute nor to create new legislation.

The General Assembly should act.  The common law approach has left courts to parse fine-grained differences in an attempt to achieve just results in individual cases.[23]

---

This Act cannot be used by a third party, seeking to rebut the presumption, to compel a presumed father to submit to a blood test." (emphasis removed));  *Jones v. Trojak*, 634 A.2d 201, 206 (Pa. 1993) ("Only when the doctrine of estoppel does not apply will the mother be permitted to proceed with a paternity claim against a putative father with the aid of a blood test.").

[20]     *See, e.g., Miscovich v. Miscovich*, 688 A.2d 726, (Pa. Super. 1997) (affirming a refusal to admit DNA evidence when the presumption had not been overcome); *Redman v. Radovich*, 678 A.2d 416 (Pa. Super. 1996) (affirming that a trial court has authority to order tests pursuant to the Act); *Selm v. Elliott*, 602 A.2d 358 (Pa. Super. 1992) (affirming order for genetic testing after the presumption of paternity had been overcome).

[21]     *K.E.M.*, 38 A.3d at 809.  *But see id.* at 807 (recognizing the continuing viability of the common law doctrines "in the absence of definitive legislative involvement").

[22]     *See, e.g., V.L.-P. v. S.R.D.*, 288 A.3d 502, 521 (Pa. Super. 2023) (declining to extend *K.E.M.* to cases involving the fraud exception and stating "we simply do not hold, as the trial court did, that a child's best interests are elevated over the interests of a party who has been defrauded"); *M.L. v. J.G.M.*, 132 A.3d 1005, 1009 (Pa. Super. 2016) (stating that blood tests are irrelevant if paternity by estoppel applies and remanding for a determination on estoppel to include "a searching inquiry of the father-child relationship and the child's best interests").

[23]     *See K.E.M.*, 38 A.3d at 809 (recognizing that trial courts are trying to follow "an evolving set of appellate court decisions which, in many respects, are difficult to reconcile.").

In light of current scientific technology, parentage of a child can be determined easily and almost always conclusively. However, the common law has barred the use of determinative DNA tests in many cases because of continued application of the presumption or estoppel. Consequently, courts must blind themselves to a scientific fact that the parties can learn through a simple, easy test, one that can be purchased at a local drugstore. To be sure, if DNA testing was employed as the dispositive factor, harm to children might ensue if important relationships with known parents were severed. To that end, the General Assembly could — and should — implement a multi-factor statutory test for paternity determinations. This legislative test could take into account the various considerations, such as the DNA test results, the child's relationship with the parties, the emotional well-being of the child, and the child's bond with the parties.[24] The legislature has enacted similar tests in other family law contexts, and courts are familiar with their application.[25] This type of legislation would provide courts with guidance and tools to address these complicated and emotional issues.

Further, a legislative multi-factor test would put the focus where it belongs: on the best interests of the children, not those of the adults. The presumption and estoppel examine and emphasize the behavior of the adults: is the marriage still intact, has the parent continued to hold him- or herself out as a parent, has the parent engaged in fraud or fraud by omission, etc. Courts have had to focus on the frequently unsavory behavior

---

[24]     I first urged the need for such legislation in 2011. *See* David N. Wecht & Jennifer H. Forbes, *A Multi-Factor Test Would Aid Paternity Decisions*, 82 Pa.B.A.Q. 3, 118 (2011).

[25]     *See* 23 Pa.C.S. § 5328 (identifying factors to consider in custody); 23 Pa.C.S. § 3502 (identifying factors for equitable distribution); 23 Pa.C.S. § 3701 (factors for determining alimony).

of the adults rather than on the best interests of the children,[26] and it is that latter set of interests that should always be the touchstone.  This Court has redirected the inquiry to some extent in estoppel cases, as we have limited the application of the paternity by estoppel doctrine to those cases in which it advances the best interests of the child.[27]  In the absence of legislative guidance, this Court should consider adopting a similar explicit limitation in presumption of paternity cases.  That would focus the court's attention where it belongs — on the child involved in the case.

A legislative fix to end the twin fictions of paternity is the best approach.  The General Assembly is the body best able to weigh the competing policies.  Should the General Assembly choose not to act, this Court should consider a change to the common law in an appropriate case that raises and preserves the issue.  In prior opinions, other jurists on this Court have advocated for the end of these fictions.  As Justice Nigro noted:

> In light of the changed, and increasingly fluid, nature of the family, and the increased rates of divorce and separation, these legal fictions have become less reflective of social reality.  They are now more problematic than useful, and more likely to lead to unfair results.  . . . I believe that the time has come to take this principle to its logical conclusion in the law of paternity.[28]

Justice (and later Chief Justice) Baer stated:

> I would abrogate the [estoppel] doctrine in its entirety, with the limited exception of where its invocation would preserve the status of a husband who chooses to parent a non-biological child born into an existing marriage.  Absent the scenario where mother's husband willingly undertakes parental

---

[26]     The best interests may include the child's interest in knowing his or her paternal genetic and health history as well as ethnic and/or racial heritage.

[27]     *K.E.M.*, 38 A.3d at 809 ("[T]he determination of paternity by estoppel should be better informed according to the actual best interests of the child, rather than by rote pronouncements grounded merely on the longevity of abstractly portrayed (and perhaps largely ostensible) parental relationships.").

[28]     *Brinkley*, 701 A.2d at 182 (Nigro, J. concurring and dissenting).

responsibility of his wife's child and desires to maintain it, I see no reason to perpetuate the legal fiction that the individual who cares for the child is the parent.

* * *

A recurring theme justifying the historical application of paternity by estoppel is that children should be secure in knowing who their parents are, and should not be traumatized by the discovery that the father they have known is not, in fact, their father.

* * *

While these views were perhaps forceful before genetic testing could identify a biological father with pragmatic certainty, and when being born out of wedlock carried an onerous stigma, they are of little consequence today, considering that paternity can now be established readily and conclusively, and commentators estimate that forty-one percent of American births are non-marital. . . . Moreover, it is naïve to believe that adults will not tell their child his true parentage, assuming the child is old enough to understand the issue. Thus, realistically speaking, the idea that the child will not discover the identity of his father seems absurd.[29]

In the absence of legislative action, I join those calls.

---

[29] *K.E.M.,* 38 A.3d at 814 (Baer, J. dissenting).